1
2
3
4
5

**C.O. LAW, APC**
Clark Ovruchesky, Esq. (SBN: 301844)
co@colawcalifornia.com
750 B. Street, Suite 3300
San Diego, California 92101
Telephone: (619) 356-8960
Facsimile:  (619) 330-7610

6
7
8
9
10

**SHANNER & ASSOCIATES**
Thomas K. Shanner, Esq. (SBN: 218515)
toby@shannerlaw.com
7777 Alvarado Road, Suite 307
La Mesa, CA 91942
Telephone: (619) 232-3057
Facsimile:  (619) 638-8130

11
12
13

*Attorneys for Plaintiff*,
Mary Sue Lundeen-Manning

14
15

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

16

**MARY SUE LUNDEEN-MANNING,**

17

**Plaintiff,**

18

**v.**

19
20
21
22
23
24
25

**SANTANDER CONSUMER USA INC., TOYOTA MOTOR CREDIT CORPORATION, TARGET CORPORATION D/B/A TD BANK USA/TARGET CREDIT, TRIAD FINANCIAL SERVICES, INC. D/B/A TRIAD FINANCIAL, and EQUIFAX INFORMATION SERVICES LLC,**

**Defendants.**

Case No.: **'17 CV 2188 BEN WVG**

**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:**

1.) **THE FAIR CREDIT REPORTING ACT, 15 U.S.C. §§ 1681, ET SEQ.; AND**

2.) **CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT, CAL. CIV. CODE § 1785.1, ET SEQ.**

**JURY TRIAL DEMANDED**

26
27
28

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

### INTRODUCTION

1. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy. The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers. The FCRA also imposes duties on the sources that provide credit information to credit reporting agencies, called "furnishers."

2. There exists today in the United States a pervasive and fundamental misunderstanding about the long term impact filing a consumer bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

3. The *majority* of consumer debtors who actually file consumer bankruptcy do so to *__raise__* their credit score and remedy their poor credit worthiness.

4. It is entirely possible for consumer debtors to have over a 700 Fico Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

///
///
///
///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

---

5.   Plaintiff **MARY SUE LUNDEEN-MANNING** ("Plaintiff"), through her attorneys, brings this lawsuit to challenge the actions of Defendants **SANTANDER CONSUMER USA INC. ("Santander", "Furnisher-Defendants", or "Defendants"), TOYOTA MOTOR CREDIT CORPORATION ("Toyota", "Furnisher-Defendants", or "Defendants"), TARGET CORPORATION D/B/A TD BANK USA/TARGET CREDIT ("Target", "Furnisher-Defendants", or "Defendants"), TRIAD FINANCIAL SERVICES, INC. D/B/A TRIAD FINANCIAL ("TFS", "Furnisher-Defendants", or "Defendants"), and EQUIFAX INFORMATION SERVICES LLC ("Equifax", the "Credit Bureau", or "Defendants")** with regard to Defendants' reporting of erroneous negative and derogatory reports to Plaintiff's credit report, as that term is defined by 15 U.S.C. § 1681a(g); Defendants' willful and negligent failure to properly investigate the repeated disputes of Plaintiff concerning the inaccurate data Defendants are reporting in Plaintiff's file, and Defendants' failure to correct such, which Defendants knew or should have known was erroneous and which caused Plaintiff damages.

6.   Plaintiff makes these allegations on information and belief, with the exception of allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

7.   While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

8.   Unless otherwise stated, all the conduct engaged in by Defendants occurred in California.

9.   Any violations by Defendants were knowing and intentional, and that Defendants did not maintain procedures reasonably adapted to avoid any such violation.

10. Unless otherwise indicated, the use of any Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that Defendants named.

## JURISDICTION AND VENUE

11. Jurisdiction of this Court arises pursuant to 28 U.S.C. §1331; 15 U.S.C. § 1681p; and, 28 U.S.C. § 1367 for supplemental state law claims.

12. This action arises out of Defendants' violations of (i) the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA") and (ii) the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code §§ 1785.1. et seq. ("CCCRAA").

13. The Court has personal jurisdiction over Defendants as Defendants conduct business within the State of California and have purposefully availed themselves of the laws and markets of the State of California and this district.

14. Venue is proper in the United States District Court, Southern District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in the County of San Diego, State of California, which is within this judicial district; (ii) the conduct complained of herein occurred within this judicial district; and, (iii) Defendants conducted business within this judicial district at all times relevant.

## PARTIES

15. Plaintiff is a natural person who resides in the City of Oceanside, County of San Diego, in the State of California. In addition, Plaintiff is a "consumer" as that term is defined by: Cal. Civ. Code § 1785.3(b) and 15 U.S.C. § 1681a(c).

16. Defendant Santander is a corporation, whose primary corporate address is in the City of Dallas, in the State of Texas, and is authorized to do business in the State of California.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

17. Defendant Toyota is a corporation, whose primary corporate address is in the City of Plano, in the State of Texas, and is authorized to do business in the State of California.

18. Defendant Target is a credit union whose primary address is in the City of Minneapolis, in the State of Minnesota, and is authorized to do business in the State of California.

19. Defendant TFS is a corporation, whose primary corporate address is in the City of Jacksonville, in the State of Florida, and is authorized to do business in the State of California.

20. Defendant Equifax is a corporation whose primary corporate address is in the City of Atlanta, in the State of Georgia, and is authorized to do business in the State of California.

21. Defendants Santander, Toyota, Target, and TFS ("Furnisher-Defendants") are each furnishers of information as contemplated by FCRA sections 1681s-2(a) & (b), which regularly and in the ordinary course of business furnish information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer.

22. Plaintiff is informed and believes, and thereon alleges, that Furnisher-Defendants, in the ordinary course of business, regularly, on behalf of themselves or others, engage in "debt collection" as that term is defined by California Civil Code § 1788.2(b), and are therefore "debt collectors" as that term is defined by California Civil Code § 1788.2(c).

23. Defendants Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

24. The causes of action herein also pertain to Plaintiff's "consumer credit report" as that term is defined by Cal. Civ. Code § 1785.3(c), in that inaccurate credit information was furnished by Furnisher-Defendants to "consumer reporting agencies," as that term is defined by Cal. Civ. Code § 1785.3(d), regarding

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

specific transactions and/or experiences pertaining to Plaintiff and Plaintiff's credit worthiness, credit standing, and credit capacity. Such credit information was used or was expected to be used, or collected in whole or in part, for the purposes of serving as a factor in establishing Plaintiff's eligibility for, among other things, credit to be used primarily for personal, family, household and employment purposes.

### GENERAL CREDIT REPORTING INDUSTRY ALLEGATIONS

25. Plaintiff alleges that each and every Furnisher-Defendant was included and listed in Plaintiff's Chapter 13 Bankruptcy.

26. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

27. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

28. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's ability to reorganize and repair Plaintiff's FICO Score.

29. In the alternative, Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### a. FICO

30. FICO Inc. ("FICO") is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

31. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

32. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

33. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

34. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

35. There are 28 FICO Scores that are commonly used by lenders.

36. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

37. The three largest CRAs are Equifax, Experian, and TransUnion.

38. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

39. There are five key factors that a FICO Score considers: 1) Payment history; 2) Debt Amount; 3) Length of Credit History; 4) New Credit; and 5) Credit Mix.

40. Each of the five factors is weighted differently by FICO.

41. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

///

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

---

**COMPLAINT FOR DAMAGES**

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

42. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

43. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

44. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

45. FICO Score's are entirely dependent upon information provided by Data Furnishers ("DFs") to CRAs.

46. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both "Chapters" have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

**b. Metro 2**

47. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

48. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

49.  The Consumer Data Industry Association's ("CDIA") Metro 2 format is *The* credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.[1]

50.  Therefore, the credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

51.  The CDIA is *The* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

   a.  The CDIA offers an FCRA certificate program for all CRAs

   b.  The CDIA offers an FCRA awareness program for all CRAs.

   c.  The CDIA offers an FCRA certificate program for DFs.

   d.  The CDIA offers an FCRA awareness program for DFs.

   e.  The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

   f.  The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

   g.  The CDIA developed a credit reporting resource guide for accurately reporting credit.

52.  The CDIA's Metro 2 is accepted by all CRAs.

53.  The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's Credit Reporting Resource Guide ("CRRG").

54.  The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

55.  The CRRG is not readily available to the public. It can be purchased online for

---

[1] *See* Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, available at: http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

approximately $229.45.

56. Even if a buyer is ready and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

57. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

58. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

59. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk, resulting in less favorable lending terms.

### c. e-Oscar

60. E-OSCAR is the web based Metro 2 compliant system developed by the CRAs that enables DFs and CRAs to create and respond to consumer credit disputes.

61. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-Oscar to the DF.

62. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file, e.g. "Account Type - 07" (07 in Metro 2 refers to a Charge Account).

### d. Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator ("CII")

63. When a consumer files bankruptcy, certain credit reporting industry standards exist.

64. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

65. The Consumer Information Indicator ("CII") is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

66. Under Metro 2, the CII must be reported only on the consumer to whom the information applies.

67. It is the credit reporting industry standard to report a very specific CII upon the occurrence of critical events during a consumer bankruptcy, such as the filing of the bankruptcy and the bankruptcy discharge.

68. In a consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

69. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts end users, including potential creditors, that the account is no longer subjected to its pre-bankruptcy terms, but rather is being handled by a Chapter 13 trustee.

70. CII Metro 2 Code "Z" indicated that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

71. CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

72. CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

73. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

74. The lack of an accurate reporting of the CII field makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

///

///

///

75. The lack of an accurate reporting of the CII field also suggests that creditors are free to collect against a consumer per their pre-bankruptcy contract terms, which is inaccurate and materially misleading due to the effect of the bankruptcy orders, such as the automatic stay of section 362 of Title 11, that exist to prevent post-petition collection activity, the order confirming the chapter 13 plan, and the discharge order which enjoins post-discharge collection upon any *in personam* liability for a claim.

76. Accordingly, failure to report the correct CII indicator would prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

77. Under the FCRA, a bankruptcy can be reported for ten years.

78. The ten-year rule for reporting runs from the date the bankruptcy was *filed*.

79. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

80. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.

81. Failure to reference the bankruptcy filing and/or discharge in the CII field and/or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

### GENERAL ALLEGATIONS

82. At all times relevant to this matter, Plaintiff was an individual residing within the State of California.

83. Furthermore, Defendants conducted business within the State of California at all times relevant.

///

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

84.   On or about August 30, 2013, Plaintiff filed for a Chapter 13 bankruptcy in the United States Bankruptcy Court for the Southern District of California (San Diego). Plaintiff's case was assigned Case Number 13-bk-08837 (the "Bankruptcy").[2]

85.   The obligations ("Debt") to Furnisher-Defendants were scheduled in the Bankruptcy.[3]

86.   Furnisher-Defendants received a copy and notice of the Bankruptcy filing on or about August 2013 through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center.

87.   Furnisher-Defendants did not have their Debt ordered to be "non dischargeable" pursuant to 11 U.S.C. § 523 *et seq*.

88.   Furnisher-Defendants also did not receive relief from the "automatic stay" codified at 11 U.S.C. §362 *et seq*. while the Plaintiff's Bankruptcy was pending to pursue Plaintiff for any of the underlying Debts in their pre-bankruptcy form.

89.   Further, after the Bankruptcy is filed, it is illegal and inaccurate for creditors to report any post-Bankruptcy derogatory collection information, which would be inconsistent with the Bankruptcy Orders entered by the Bankruptcy Court, including the initial Petition for Relief for Bankruptcy protection, the automatic stay, the confirmed Chapter 13 Bankruptcy Wage Earner Repayment Plan (the "Plan"), and the Discharge Order (collectively the "Bankruptcy Orders).

90.   After Plaintiff filed for a Chapter 13 Bankruptcy, she immediately began making monthly payments to the Bankruptcy Trustee.

///

///

///

---

[2] The District Court has discretion to take judicial notice of the documents electronically filed in the bankruptcy case. *See, Atwood v. Chase Manahttan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (B.A.P. 9th Cir.2003).

91.   The Bankruptcy Trustee represented Plaintiff's creditors (including Furnisher-Defendants), and was responsible for collecting payments on behalf of Plaintiff's creditors from Plaintiff and, in turn, disbursing those payments amongst Plaintiff's creditors according to the terms of the confirmed Plan.

92.   Plaintiff filed the Plan on or about February 26, 2014, and Furnisher-Defendants received a copy of the proposed Plan by first class mail from the Bankruptcy Noticing Center on or about February 27, 2014.

93.   Plaintiff's Plan was officially confirmed on or about May 6, 2014.[4]

94.   Once the Bankruptcy Court confirms a Chapter 13 Repayment Plan, a "new contract" is confirmed between a debtor and their creditors included in the Plan, and any pre-repayment plan contracts/obligations to that debtor's creditors are subject to the new repayment obligation confirmed by the Bankruptcy Court.

95.   In short, the confirmed Chapter 13 Plan is the new contract to be enforced between debtors and creditors.

96.   The terms of Plan were for Plaintiff to make payments regularly to the Trustee in the amount of $250.00 per month and that the obligations due to Furnisher-Defendants under the Plan would be satisfied over the 36-month period of the Plan.

97.   Further, the Bankruptcy Court entered a "Notice of Claims" summary in 2014, which delineated every proof of claim submitted by Plaintiff's creditors, the amount owing for each claim, the percentage of the amount owed for each claim that would be discharged following Plaintiff's successful completion of the Plan, the classification of each claim's Debt (e.g. unsecured, secured, etc.), and describes the sequence in which payments will be made to creditors by the trustee.[5]

---

[4] "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."  11 U.S.C. § 1327(a).
[5] The standing chapter 13 trustee is required to, "dispose of, under regulations

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

98. Any Furnisher-Defendants who timely submitted proof of claims through Plaintiff's Bankruptcy were paid pursuant to the terms of the Plan and Notice of Claims.

99. In the credit reporting context, in a Chapter 13 Repayment Plan, the Furnisher-Defendants who submitted proofs of claims through Plaintiff's Bankruptcy were paid on time as long as Plaintiff paid $250.00 per month to the Bankruptcy Trustee.

100. Any Furnisher-Defendants who failed to submit proofs of claims through Plaintiff's Bankruptcy forwent all payments to them through the Plan, and, post-discharge, extinguished any personal obligation Plaintiff had before filing the Bankruptcy to repay them.

101. In the credit reporting context, in a Chapter 13 Repayment Plan, the Furnisher-Defendants who failed to file a proof of claim in the Bankruptcy waived the right to report a debt as not paid on time through the Trustee's distributions.

102. If Plaintiff failed to consistently make the necessary repayment payments to the Bankruptcy Trustee every month, then the Bankruptcy would have been in danger of being dismissed, rather than towards the path of a successful discharge.

103. However, Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

104. In other words, Plaintiff fully executed her statutory obligation to make Plan payments to the Trustee, who acted to collect on behalf of Furnisher-Defendants and made distributions according to Plaintiff's obligations.

///

///

issued by the Director of the Administrative Office of the United States Courts, moneys received or to be received" and "distribute any such payment in accordance with the plan as soon as is practicable".  11 U.S.C. §§ 1302, 1326.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

105. On or about March 13, 2017, the Bankruptcy Trustee filed the "Chapter 13 Standing Trustee's Final Report and Account", which reflected that Plaintiff made all payments required through the Plan. Furnisher-Defendants received notice of this report by first class mail from the Bankruptcy Noticing Center on or about March 14, 2017.

106. Accordingly, Plaintiff's Bankruptcy was successfully discharged on December 19, 2016.

107. Accordingly, the Debt to Furnisher-Defendants was discharged through the Bankruptcy and Furnisher-Defendants received notice of the successful discharge from the Bankruptcy Noticing Center on or about December 20, 2016.

108. Again, after the Bankruptcy is filed, it is illegal and inaccurate for creditors to report any post-Bankruptcy derogatory collection information, which would be inconsistent with the Bankruptcy Orders entered by the Bankruptcy Court, including the initial Petition for Relief for Bankruptcy protection, the automatic stay, the Bankruptcy Plan, and the Discharge Order.

109. However, Furnisher-Defendants either reported or caused to be reported inaccurate information after the Bankruptcy was filed on Plaintiff's credit reports.

110. Furnisher-Defendants attempted to collect upon their respective Debt by reporting post-Bankruptcy derogatory information on Plaintiff's credit report(s), that was inconsistent with the Bankruptcy Orders, which is an illegal collection activity, was therefore inaccurate and materially misleading under the FCRA/CCCRAA and even prohibited by the automatic stay and discharge.

///
///
///
///

111. Furnisher-Defendants' reporting of post-Bankruptcy derogatory information was inaccurate in that Furnisher-Defendants continued reporting information based on Furnisher-Defendants' pre-bankruptcy contract terms with the Plaintiff, which were no longer enforceable upon the bankruptcy filing and confirmation of the Bankruptcy Plan, thereby rendering the disputed information inaccurate and materially misleading.

112. Furnisher-Defendants' reporting of post-Bankruptcy derogatory information was also inaccurate because a default on an account in a bankruptcy can occur no later than the bankruptcy filing date, at which point the accounts in the Bankruptcy were no longer legally collectable in their pre-Bankruptcy form due to the effect of the automatic stay, confirmed plan, and successful discharge. Thus, by reporting post-Bankruptcy derogatory information, Furnisher-Defendants made Plaintiff's pre-Bankruptcy Debt appear more recently subject to collection than it really was, which is inaccurate and materially misleading.

113. Even if reporting debts in their pre-bankruptcy form during the life of the Chapter 13 Plan was accurate, which it was not, failing to report payments made to the Bankruptcy Trustee every month, which was in turn disbursed amongst Plaintiff's creditors, was inaccurate and materially misleading because doing so would lower the amount of the debt owed even in its pre-bankruptcy form.

114. Moreover, the post-Bankruptcy derogatory, delinquent information furnished by Furnisher-Defendants after Plaintiff filed the Bankruptcy was inaccurate and materially misleading because end users, including potential creditors, would interpret delinquencies on accounts after Plaintiff filed for the Bankruptcy to mean that Plaintiff was being noncompliant with her repayment obligations through the Bankruptcy Plan, and her bankruptcy was at risk of being dismissed, rather than towards the path of a successful discharge.[6]

---

[6] The United States Bankruptcy Court for the Southern District specifically provides for the extension of credit during the pendency of a chapter 13 plan.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

115. Further, the Consumer Data Industry Association's ("CDIA") Metro 2 format is the credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.[7]

116. Upon information and belief, Furnisher-Defendants have adopted the *Metro 2 Format Manual* as its standard instruction book in respect to credit reporting.

117. Specifically, the Metro 2 Format guidelines for credit reporting instruct furnishers to report a CII current account status of "Petition for Chapter 13 Bankruptcy" during the month the bankruptcy is filed, during the months between the petition and the bankruptcy plan is confirmed, and during the month the plan is confirmed.

118. Once the bankruptcy plan is completed, i.e. all payments are made according to the bankruptcy plan, Metro 2 Format guidelines instruct furnishers to report a CII current account status of "Discharged/completed through BK Chapter 13."

119. Furnishers are also instructed to report the value indicator "D", i.e. "no data", in the "Payment History" section for the months between the bankruptcy petition is filed and there is a confirmed plan, after the confirmation of the plan, and after the plan is completed.

///
///
///
///
///
///
///

---

[7] *See* Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, available at: http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

120. Further, once the Plan is confirmed furnishers are instructed to report the Chapter 13 Plan balance as the "Current Balance", to report the "Amount Past Due" as "Zero", not report the account as delinquent[8], and to report the Plan amount for the "Scheduled Monthly Payment Amount."

121. If a Plan does not call for payments to be made on a particular debt, the accurate credit reporting standard is to report a $0.00 current balance.

122. The "Current Balance" should decrease over the course of the Plan as payments are made from the Bankruptcy Trustee to Creditors.

123. Once the Plan is successfully completed, furnishers for unsecured accounts are instructed to report the CII status as "Discharged/completed through BK Chapter 13", report "Current Balance", "Scheduled Monthly Payment Amount", and "Amount Past Due" as "Zero" (i.e. $0), and continue reporting "D", i.e. "no data", in the "Payment History" section.

124. However, for secured debts that consumers continue to make payments on following the completion of the Bankruptcy Plan, furnishers are instructed to update: (1) the Account Status that applies (e.g. "Current"); (2) the Payment History; (3) the Current Balance (i.e. Outstanding balance amount); (4) Scheduled Monthly Payment Amount; and (5) Amount Past Due to the proper status/amount that applies.

125. The CDIA and credit reporting industry recognize that allowing creditors to continuously report ongoing delinquencies and past due balances post confirmation of the Plan would objectively make filing Chapter 13 and repaying creditors exponentially worse for a consumer's credit worthiness as opposed to

---

[8] *In re Luedtke*, 2008 WL 2952530 (Bankr. E.D. Wis. July 31, 2008) (noting that debtors sometimes use chapter 13 plans to establish a track record of payments to rehabilitate their credit records, and allowing reporting of account as delinquent is contrary to spirit and purpose of chapter 13). *Cf. In re Burkey*, 2012 WL 5959991 (Bankr. N.D.N.Y. Nov. 28, 2012) (provisions of confirmed plan bind the creditor, but creditor can report delinquencies on co-debtor's credit report, since plan did not alter co-debtor's liability under the loan).

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

filing Chapter 7. Thus, deviation from the aforementioned credit reporting industry standards shall result in a more negative inference being drawn with respect to a consumer's credit worthiness.

126. Upon information and belief, Plaintiff alleges that Furnisher-Defendants voluntarily choose to choose to subscribe to the Metro 2 format in their credit reporting practices to credit reporting agencies, but did not comply with the Metro 2 reporting standards in respect to Plaintiff's accounts.

127. End users, including potential creditors, would have thus expected Furnisher-Defendants to report in compliance with the Metro 2 format.

128. Potential creditors familiar with Furnisher-Defendants' standard credit reporting methods would be misled by seeing Furnisher-Defendants reporting derogatory delinquencies in respect to the Debt to believe that Plaintiff incurred new debt during the Bankruptcy or that Plaintiff reaffirmed the debt notwithstanding the discharge because Furnisher-Defendants' reporting deviated from Metro 2 reporting instructions in these respects.

129. However, Plaintiff did not incur new debt with Furnisher-Defendants during the Bankruptcy proceeding or reaffirm the Debt in the Bankruptcy.

130. Accordingly, by reporting post-Bankruptcy delinquent and derogatory information, Furnisher-Defendants did not comply with the Metro 2 format.

131. Even if Furnisher-Defendants reported accurately elsewhere in the same account tradeline to the Credit Bureaus that, for example, the Debt was "discharged in the Bankruptcy," such reporting would be patently inconsistent, confuse potential creditors, and thus, be inherently inaccurate and materially misleading.

///

///

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

132. Furnishers utilizing the Metro 2 reporting standard correctly is crucial because the Metro 2 system creates a uniform standard for the meaning given to each field provided, which fosters consistency in how furnishers formulate data to report to the credit bureaus, which ultimately leads to objective credit evaluations and scores for consumers.

133. Moreover, the FCRA and CCCRAA impose no requirement or mandate that a furnisher provide any information to a consumer reporting agency. Indeed, the CDIA has repeatedly noted that the act of furnishing information to a consumer reporting agency is completely voluntary.[9]

134. Accordingly, once Plaintiff filed the Bankruptcy and the Bankruptcy Plan was confirmed by the Bankruptcy Court's Order, Furnisher-Defendants were required to report accurately according to the terms of Plaintiff's confirmed Plan to the consumer reporting agencies or not report Plaintiff's accounts at all.

135. Upon information and belief, Plaintiff alleges that Furnisher-Defendants did not comply with the Metro 2 reporting standards in respect to Plaintiff's accounts and reported inaccurately by failing to comport their reporting practices with the terms of the Bankruptcy Plan and Plaintiff's participation in the Bankruptcy Plan.

136. Accordingly, Furnisher-Defendants' non-compliance with the Metro 2 reporting standards constitutes an inaccurate and materially misleading statement under the FCRA and CCCRAA, because a furnisher that fails to comply with the uniform and objective Metro 2 reporting standards compromises the credit reporting system.

---

[9] *See, e.g.,* Credit Reports: Consumers' Ability to Dispute and Change Inaccurate Information: Hearing Before the H. Comm. on Fin. Serv., 110 Congr. 50 (2007) (written statement of Stuart Pratt, President and CEO, Consumer Data Industry Association) ("not a single one of the more than 18,000 data furnishers has to provide a single record of data to our members").

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

137. Because credit reporting is a voluntary act, Furnisher-Defendants' deviation from the Metro 2 format instructions—the industry standard and their respective chosen method of reporting—constitutes an inaccurate or misleading statement. This is because those making credit decisions, who would expect that furnishers like Furnisher-Defendants would adhere to the Metro 2 format, would view the reporting of accounts included in the Bankruptcy in their delinquent pre-bankruptcy form more negatively than reporting that the accounts were being repaid pursuant to Plaintiff's participation in the Bankruptcy Plan and then ultimately discharged.

138. In other words, Furnisher-Defendants' failure to adhere to the Metro 2 format would prompt those making credit decisions to draw a more negative inference from Furnisher-Defendants' reporting and, in turn, be less likely to approve Plaintiff for an extension of credit.

139. Plaintiff subsequently learned that Furnisher-Defendants reported derogatory, inaccurate credit information regarding the status and treatment of Plaintiff's obligations to them on Plaintiff's credit reports after Plaintiff's Bankruptcy filing, after Plaintiff's Bankruptcy Plan was confirmed by the bankruptcy court, and after Plaintiff's Bankruptcy discharge, thereby causing erroneous and negative credit information in Plaintiff's credit files and damaging Plaintiff's creditworthiness.

140. In respect to their investigations, Plaintiff alleges Furnisher-Defendants, rather than train its employees how to properly review and investigate disputes, are generally expected to simply confirm whatever information being reported is accurate, rather than conducting an actual reasonable investigation.

141. Similarly, Plaintiff alleges the Credit Bureaus' employees have a policy of simply parroting whatever information is provided by furnishers rather than conducting a reasonable reinvestigation.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

142. This is because the investigation and reinvestigations conducted by the Furnisher-Defendants and Credit Bureaus, respectively, occur in a hurried, conveyor-belt styled atmosphere in which dispute operators are under pressure to process disputes quickly to meet production quotas. This hurried, conveyor-belt styled atmosphere is conducive to a speed-minded dispute operator failing to consider, or not looking for, information that is relevant to the consumer's dispute.

143. Such conduct by Defendants is willful and reckless.

144. As a direct and proximate result of Defendants' willful and untrue communications, Plaintiff has suffered actual damages including, but not limited to, reviewing credit reports, incurring attorney's fees, and such further expenses in an amount to be determined at trial.

145. As a further direct and proximate result of Defendants' acts stated herein, Plaintiff incurred pain and suffering, was impeded in seeking necessary products and services from vendors, suffered humiliation, embarrassment, anxiety, loss of sleep, emotional distress, and defamation of character.

### SANTANDER INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 3000017784994*

146. In an Equifax Credit Report dated April 28, 2017, Santander reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Scheduled Payment Amount: $540

147. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on December 19, 2016.

148. Accordingly, Santander's Debt was discharged and Santander received notice of the successful discharge through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center on or about December 20, 2016.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

149. It was inaccurate and materially misleading for Santander to report the above "Scheduled Payment" amount of $540 because the client no longer had a scheduled payment due on the account following her successful bankruptcy discharge.

150. The "Scheduled Payment" amount reported by Santander and Equifax, as opposed to the correct scheduled payment amount of $0 following Plaintiff's Bankruptcy, inaccurately and misleadingly suggested that Plaintiff still has a personal legal liability to pay on the alleged Debt to Santander, which is the opposite effect of Plaintiff receiving a Chapter 13 bankruptcy discharge.

151. Alternatively, Plaintiff alleges she paid off the account in satisfaction of the Debt. Accordingly, the scheduled payment amount should have reported as $0.

152. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

153. Therefore, Plaintiff was not delinquent on the Santander account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for Santander to report that Plaintiff was delinquent after the bankruptcy.

154. Rather than using the bankruptcy information sent specifically to Santander, which Santander knew or should have known existed, Santander continued reporting inaccurately on Plaintiff's credit reports.

155. Santander's credit reporting information is relevant to Plaintiff's credit score, and Santander's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

156. Therefore, Santander's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

157. Through this conduct, Santander has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that Santander knew or should known was inaccurate and materially misleading.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

158. Santander and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

159. Equifax even reported the Bankruptcy in its respective "Public Records" section of Plaintiff's credit report, and reflected that the Bankruptcy was filed on August 2013 and discharged in December 2016. Therefore, Equifax had notice of the Bankruptcy.

160. Moreover, Equifax had notice of the Bankruptcy due to multiple other accounts reporting in Plaintiff's credit reports notating the Bankruptcy.

161. However, even with notice of the Bankruptcy filing and discharge, Equifax allowed Santander to report the above inaccurate and derogatory information, for a debt that was included and discharged in the Bankruptcy, after Plaintiff filed the Bankruptcy and received a discharge.

162. Rather than using the publicly available bankruptcy information that Equifax knew or should have known existed, Equifax chose to allow Santander to continue reporting inaccurately on Plaintiff's credit reports.

163. Equifax's credit reporting information is relevant to Plaintiff's FICO credit score, and Equifax's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

164. Therefore, Equifax's inaccurate and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

165. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

166. On or about August 2017, Plaintiff disputed Santander's reported information regarding the Debt pursuant to 15 U.S.C. § 1681I(a)(2) by notifying Equifax, in writing, of the incorrect and inaccurate credit information furnished by Santander.

167. Specifically, Plaintiff sent a letter, via certified mail, to Equifax (the "Dispute Letter"), requesting the above inaccurate information be corrected/deleted because there was no longer a "Scheduled Payment" owing on the account.

168. The Dispute Letter further requested that Equifax:

- Immediately delete the disputed derogatory information from my credit report and update my credit report accordingly.

- If you do not immediately correct the disputed information on my credit report, please include the "Consumer Dispute" section above as my dispute statement for this account on my credit report.

169. Upon information and belief, Equifax timely notified Santander of Plaintiff's dispute, but they both continued reporting inaccurate, derogatory information.

170. Santander was required to conduct a reasonable investigation into this specific account on Plaintiff's consumer report pursuant to 15 U.SC. § 1681s-2(b)(1)(A).

171. Equifax was required to conduct a reasonable reinvestigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. §1681i.

172. On or about August 27, 2017, Plaintiff received notification from Equifax that Santander and Equifax received notice of Plaintiff's dispute pursuant to 15 U.S.C. § 1681i(a)(6) and were providing the results of the reinvestigation.

173. However, rather than remove the above derogatory information from Plaintiff's report, Santander and Equifax simply left derogatory information on Plaintiff's report.

174. Specifically, Santander and Equifax reported the following inaccurate and derogatory information on Plaintiff's credit in respect to the Santander account:

- Scheduled Payment Amount: $540.

175. Equifax did not provide notice to Plaintiff that her dispute was "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3).

176. Moreover, upon information and belief, Equifax's reinvestigation was not reasonable. More specifically, Equifax should have discovered from its records, including Plaintiff's official dispute letter, that the information Santander was reporting was inaccurate and materially misleading. Equifax could have easily ascertained that the Santander account no longer had a scheduled payment due by reviewing the publically available and accessible bankruptcy records discussed above, requesting Plaintiff's account records from Santander, or contacting Plaintiff for more information.

177. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

178. Accordingly, Equifax failed to conduct a reasonable reinvestigation with respect to the disputed information as required by 15 U.S.C. §1681i.

179. Upon information and belief, Santander's investigation was also not reasonable. More specifically, Santander should have discovered from its internal records, including Plaintiff's official dispute letter, that the information Santander was reporting was inaccurate and materially misleading. Specifically, Santander could have simply reviewed the bankruptcy records discussed above and personally received by Santander throughout the course of the Bankruptcy and recognized that the correct, current "Scheduled Payment" due from Plaintiff was $0. Santander could have also consulted with and conformed their credit reporting to properly follow the Metro 2 instructions.

180. Accordingly, Santander failed to conduct a reasonable investigation with respect to the disputed information as required by 15 U.SC. § 1681s-2(b) by:

    a. Failing to remove all of the disputed and incorrect information;

    b. Failing to update Plaintiff's Account (history); and

    c. Failing to notate, as required, Plaintiff's dispute.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

181. Through this conduct, Santander has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that Santander knew or should known was inaccurate and materially misleading.

182. Santander and Equifax failed to review all relevant information provided by Plaintiff in the dispute to Equifax as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

183. Due to Santander and Equifax's failure to reasonably (re)investigate, they each further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

184. Plaintiff's continued efforts to correct Santander and Equifax's erroneous and negative reporting of the Debt by communicating Plaintiff's dispute with Santander and Equifax were fruitless.

185. Santander and Equifax's continued inaccurate and negative reporting of the Debt in light of its knowledge of the actual error was willful.

186. Santander and Equifax's failure to correct the previously disclosed inaccuracies on Plaintiff's credit report was intentional and in reckless disregard of its duty to refrain from reporting inaccurate information. Accordingly, Santander and Equifax willfully and negligently failed to comply with its duty to reasonably investigate Plaintiff's dispute.

187. Santander and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

188. By inaccurately reporting account information relating to the Debt after notice and confirmation of its errors, Santander and Equifax failed to take the appropriate measures as determined in 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E)

///

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

### TOYOTA INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNTS NO.: 7040336289794* AND 7040336255453*

189. In an Equifax Credit Report dated April 28, 2017, Toyota reported the following inaccurate, misleading, and derogatory information for the above-referenced account numbers ending in 9794 and 5453:

- Scheduled Payment Amount: $634

190. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on December 19, 2016.

191. Accordingly, Toyota's Debt was discharged and Toyota received notice of the successful discharge through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center on or about December 20, 2016.

192. It was inaccurate and materially misleading for Toyota to report the above "Scheduled Payment" amounts of $634 because the client no longer had a scheduled payment due on the accounts following her successful bankruptcy discharge.

193. The "Scheduled Payment" amount reported by Toyota and Equifax, as opposed to the correct scheduled payment amount of $0 following Plaintiff's Bankruptcy, inaccurately and misleadingly suggested that Plaintiff still has a personal legal liability to pay on the alleged Debt to Toyota, which is the opposite effect of Plaintiff receiving a Chapter 13 bankruptcy discharge.

194. Alternatively, Plaintiff alleges she paid off the account in satisfaction of the Debt. Accordingly, the scheduled payment amounts should have reported as $0.

195. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

///

///

196. Therefore, Plaintiff was not delinquent on the Toyota account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for Toyota to report that Plaintiff was delinquent after the bankruptcy.

197. Rather than using the bankruptcy information sent specifically to Toyota, which Toyota knew or should have known existed, Toyota continued reporting inaccurately on Plaintiff's credit reports.

198. Toyota's credit reporting information is relevant to Plaintiff's credit score, and Toyota's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

199. Therefore, Toyota's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

200. Through this conduct, Toyota has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that Toyota knew or should known was inaccurate and materially misleading.

201. Toyota and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

202. Equifax even reported the Bankruptcy in its respective "Public Records" section of Plaintiff's credit report, and reflected that the Bankruptcy was filed on August 2013 and discharged in December 2016. Therefore, Equifax had notice of the Bankruptcy.

203. Moreover, Equifax had notice of the Bankruptcy due to multiple other accounts reporting in Plaintiff's credit reports notating the Bankruptcy.

204. However, even with notice of the Bankruptcy filing and discharge, Equifax allowed Toyota to report the above inaccurate and derogatory information, for a debt that was included and discharged in the Bankruptcy, after Plaintiff filed the Bankruptcy and received a discharge.

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

205. Rather than using the publicly available bankruptcy information that Equifax knew or should have known existed, Equifax chose to allow Toyota to continue reporting inaccurately on Plaintiff's credit reports.

206. Equifax's credit reporting information is relevant to Plaintiff's FICO credit score, and Equifax's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

207. Therefore, Equifax's inaccurate and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

208. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

209. On or about August 2017, Plaintiff disputed Toyota's reported information regarding the Debt pursuant to 15 U.S.C. § 1681I(a)(2) by notifying Equifax, in writing, of the incorrect and inaccurate credit information furnished by Toyota.

210. Specifically, Plaintiff sent a letter, via certified mail, to Equifax (the "Dispute Letter"), requesting the above inaccurate information be corrected/deleted necause there was no longer a "Scheduled Payment" owed on the account.

211. The Dispute Letter further requested that Equifax:

- Immediately delete the disputed derogatory information from my credit report and update my credit report accordingly.
- If you do not immediately correct the disputed information on my credit report, please include the "Consumer Dispute" section above as my dispute statement for this account on my credit report.

212. Upon information and belief, Equifax timely notified Toyota of Plaintiff's dispute, but they both continued reporting inaccurate, derogatory information.

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

213. Toyota was required to conduct a reasonable investigation into this specific account on Plaintiff's consumer report pursuant to 15 U.SC. § 1681s-2(b)(1)(A).

214. Equifax was required to conduct a reasonable reinvestigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. §1681i.

215. On or about August 27, 2017, Plaintiff received notification from Equifax that Toyota and Equifax received notice of Plaintiff's dispute pursuant to 15 U.S.C. § 1681i(a)(6) and were providing the results of the reinvestigation.

216. However, rather than remove the above derogatory information from Plaintiff's report, Toyota and Equifax simply left derogatory information on Plaintiff's report.

217. Specifically, Toyota and Equifax reported the following inaccurate and derogatory information on Plaintiff's credit in respect to both Toyota accounts:

   • Scheduled Payment Amount: $634.

218. Equifax did not provide notice to Plaintiff that her dispute was "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3).

219. Moreover, upon information and belief, Equifax's reinvestigation was not reasonable. More specifically, Equifax should have discovered from its records, including Plaintiff's official dispute letter, that the information Toyota was reporting was inaccurate and materially misleading. Equifax could have easily ascertained that the Toyota account no longer had a scheduled payment due by reviewing the publically available and accessible bankruptcy records discussed above, requesting Plaintiff's account records from Toyota, or contacting Plaintiff for more information.

220. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

221. Accordingly, Equifax failed to conduct a reasonable reinvestigation with respect to the disputed information as required by 15 U.S.C. §1681i.

222. Upon information and belief, Toyota's investigation was also not reasonable. More specifically, Toyota should have discovered from its internal records, including Plaintiff's official dispute letter, that the information Toyota was reporting was inaccurate and materially misleading. Specifically, Toyota could have simply reviewed the bankruptcy records discussed above and personally received by Toyota throughout the course of the Bankruptcy and recognized that the correct, current "Scheduled Payment" due from Plaintiff was $0. Toyota could have also consulted with and conformed their credit reporting to properly follow Metro 2 reporting instructions.

223. Accordingly, Toyota failed to conduct a reasonable investigation with respect to the disputed information as required by 15 U.SC. § 1681s-2(b) by:

    a. Failing to remove all of the disputed and incorrect information;

    b. Failing to update Plaintiff's Account (history); and

    c. Failing to notate, as required, Plaintiff's dispute.

224. Through this conduct, Toyota has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that Toyota knew or should known was inaccurate and materially misleading.

225. Toyota and Equifax failed to review all relevant information provided by Plaintiff in the dispute to Equifax as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

226. Due to Toyota and Equifax's failure to reasonably (re)investigate, they each further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

///

///

227. Plaintiff's continued efforts to correct Toyota and Equifax's erroneous and negative reporting of the Debt by communicating Plaintiff's dispute with Toyota and Equifax were fruitless.

228. Toyota and Equifax's continued inaccurate and negative reporting of the Debt in light of its knowledge of the actual error was willful.

229. Toyota and Equifax's failure to correct the previously disclosed inaccuracies on Plaintiff's credit report was intentional and in reckless disregard of its duty to refrain from reporting inaccurate information. Accordingly, Toyota and Equifax willfully and negligently failed to comply with its duty to reasonably investigate Plaintiff's dispute.

230. Toyota and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

231. By inaccurately reporting account information relating to the Debt after notice and confirmation of its errors, Toyota and Equifax failed to take the appropriate measures as determined in 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).

**TFS INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 4000018227837\***

232. In an Equifax Credit Report dated April 28, 2017, TFS reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Scheduled Payment Amount: $585

233. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on December 19, 2016.

234. Accordingly, TFS's Debt was discharged and TFS received notice of the successful discharge through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center on or about December 20, 2016.

235. It was inaccurate and materially misleading for TFS to report the above "Scheduled Payment" amount of $585 because the client no longer had a scheduled payment due on the account following her successful bankruptcy discharge.

236. The "Scheduled Payment" amount reported by TFS and Equifax, as opposed to the correct scheduled payment amount of $0 following Plaintiff's Bankruptcy, inaccurately and misleadingly suggested that Plaintiff still has a personal legal liability to pay on the alleged Debt to TFS, which is the opposite effect of Plaintiff receiving a Chapter 13 bankruptcy discharge.

237. Alternatively, Plaintiff alleges she paid off the account in satisfaction of the Debt. Accordingly, the scheduled payment amount should have reported as $0.

238. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

239. Therefore, Plaintiff was not delinquent on the TFS account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for TFS to report that Plaintiff was delinquent after the bankruptcy.

240. Rather than using the bankruptcy information sent specifically to TFS, which TFS knew or should have known existed, TFS continued reporting inaccurately on Plaintiff's credit reports.

241. TFS's credit reporting information is relevant to Plaintiff's credit score, and TFS's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

242. Therefore, TFS's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

243. Through this conduct, TFS has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that TFS knew or should known was inaccurate and materially misleading.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

244. TFS and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

245. Equifax even reported the Bankruptcy in its respective "Public Records" section of Plaintiff's credit report, and reflected that the Bankruptcy was filed on August 2013 and discharged in December 2016. Therefore, Equifax had notice of the Bankruptcy.

246. Moreover, Equifax had notice of the Bankruptcy due to multiple other accounts reporting in Plaintiff's credit reports notating the Bankruptcy.

247. However, even with notice of the Bankruptcy filing and discharge, Equifax allowed TFS to report the above inaccurate and derogatory information, for a debt that was included and discharged in the Bankruptcy, after Plaintiff filed the Bankruptcy and received a discharge.

248. Rather than using the publicly available bankruptcy information that Equifax knew or should have known existed, Equifax chose to allow TFS to continue reporting inaccurately on Plaintiff's credit reports.

249. Equifax's credit reporting information is relevant to Plaintiff's FICO credit score, and Equifax's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

250. Therefore, Equifax's inaccurate and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

251. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

252. On or about August 2017, Plaintiff disputed TFS's reported information regarding the Debt pursuant to 15 U.S.C. § 1681I(a)(2) by notifying Equifax, in writing, of the incorrect and inaccurate credit information furnished by TFS.

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

253. Specifically, Plaintiff sent a letter, via certified mail, to Equifax (the "Dispute Letter"), requesting the above inaccurate information be corrected/deleted because there was no longer a "Scheduled Payment" owing on the Account.

254. The Dispute Letter further requested that Equifax:

- Immediately delete the disputed derogatory information from my credit report and update my credit report accordingly.

- If you do not immediately correct the disputed information on my credit report, please include the "Consumer Dispute" section above as my dispute statement for this account on my credit report.

255. Upon information and belief, Equifax timely notified TFS of Plaintiff's dispute, but they both continued reporting inaccurate, derogatory information.

256. TFS was required to conduct a reasonable investigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. § 1681s-2(b)(1)(A).

257. Equifax was required to conduct a reasonable reinvestigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. §1681i.

258. On or about August 27, 2017, Plaintiff received notification from Equifax that TFS and Equifax received notice of Plaintiff's dispute pursuant to 15 U.S.C. § 1681i(a)(6) and were providing the results of the reinvestigation.

259. However, rather than remove the above derogatory information from Plaintiff's report, TFS and Equifax simply left derogatory information on Plaintiff's report.

260. Specifically, TFS and Equifax reported the following inaccurate and derogatory information on Plaintiff's credit in respect to the TFS account:

- Scheduled Payment Amount: $585.

261. Equifax did not provide notice to Plaintiff that her dispute was "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3).

C.O. LAW, APC<br>750 B. STREET, SUITE 3300<br>SAN DIEGO, CA 92101

262. Moreover, upon information and belief, Equifax's reinvestigation was not reasonable. More specifically, Equifax should have discovered from its records, including Plaintiff's official dispute letter, that the information TFS was reporting was inaccurate and materially misleading. Equifax could have easily ascertained that the TFS account no longer had a scheduled payment due by reviewing the publically available and accessible bankruptcy records discussed above, requesting Plaintiff's account records from TFS, or contacting Plaintiff for more information.

263. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

264. Accordingly, Equifax failed to conduct a reasonable reinvestigation with respect to the disputed information as required by 15 U.S.C. §1681i.

265. Upon information and belief, TFS's investigation was also not reasonable. More specifically, TFS should have discovered from its internal records, including Plaintiff's official dispute letter, that the information TFS was reporting was inaccurate and materially misleading. Specifically, TFS could have simply reviewed the bankruptcy records discussed above and personally received by TFS throughout the course of the Bankruptcy and recognized that the correct, current "Scheduled Payment" due from Plaintiff was $0. TFS could have also consulted with and conformed their credit reporting to properly follow the Metro 2 instructions discussed above.

266. Accordingly, TFS failed to conduct a reasonable investigation with respect to the disputed information as required by 15 U.SC. § 1681s-2(b) by:

    a. Failing to remove all of the disputed and incorrect information;

    b. Failing to update Plaintiff's Account (history); and

    c. Failing to notate, as required, Plaintiff's dispute.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

267. Through this conduct, TFS has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that TFS knew or should known was inaccurate and materially misleading.

268. TFS and Equifax failed to review all relevant information provided by Plaintiff in the dispute to Equifax as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

269. Due to TFS and Equifax's failure to reasonably (re)investigate, they each further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

270. Plaintiff's continued efforts to correct TFS and Equifax's erroneous and negative reporting of the Debt by communicating Plaintiff's dispute with TFS and Equifax were fruitless.

271. TFS and Equifax's continued inaccurate and negative reporting of the Debt in light of its knowledge of the actual error was willful.

272. TFS and Equifax's failure to correct the previously disclosed inaccuracies on Plaintiff's credit report was intentional and in reckless disregard of its duty to refrain from reporting inaccurate information. Accordingly, TFS and Equifax willfully and negligently failed to comply with its duty to reasonably investigate Plaintiff's dispute.

273. TFS and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

274. By inaccurately reporting account information relating to the Debt after notice and confirmation of its errors, TFS and Equifax failed to take the appropriate measures as determined in 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).

///

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

### TARGET INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 37646…*

275. In an Equifax Credit Report dated April 28, 2017, Target reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Historical Account Information: $761-$847 Past Due from August 2015 to December 2016.

276. Target filed a proof of claim for $917.11 in Plaintiff's Bankruptcy.

277. According to the Bankruptcy Court's "Notice of Claims" Order (entered on May 29, 2014), Target's Debt was "unsecured" and over the course of the Plan, Plaintiff would pay 17% of Target's Debt to the Bankruptcy Trustee, while the remaining 83% of Target's Debt would be discharged upon Plaintiff's successful completion of the Plan.

278. It was inaccurate and materially misleading for Target to report the above derogatory delinquencies related to Plaintiff's pre-Bankruptcy obligations after August 30, 2013, because Plaintiff filed for Bankruptcy on August 30, 2013, at which point the automatic stay went into effect and severed Target's ability to enforce Plaintiff's purported pre-Bankruptcy obligations against Plaintiff personally in their pre-bankruptcy form.

279. Moreover, the above adverse information was also inaccurate and materially misleading because the Bankruptcy Plan (i.e. the new contract between Plaintiff and Target) determined how Target would be paid. Failing to report consistent with the terms of the Bankruptcy Plan was therefore inaccurate and materially misleading.

///

///

///

///

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

280. Moreover, the post-Bankruptcy derogatory, delinquent information furnished by Target after Plaintiff filed the Bankruptcy was inaccurate and materially misleading because end users, including potential creditors, would interpret the delinquencies to mean that Plaintiff was being noncompliant with her repayment obligations during the Bankruptcy Plan.

281. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on April 18, 2017.

282. Accordingly, if Target chose to continue reporting on Plaintiff's credit reports, Target was required to report accurately according to Plaintiff's participation in the Bankruptcy Plan.

283. Yet Target failed to accurately report according to Plaintiff's participation and payments stemming from the Bankruptcy Plan, making Target's reporting inaccurate and materially misleading under the FCRA and CCCRAA.

284. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

285. Therefore, Plaintiff was not delinquent on the Target account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for Target to report that Plaintiff was delinquent after the bankruptcy.

286. Accordingly, pursuant to the terms of the Bankruptcy Orders and the Metro 2 reporting standards discussed, it was inaccurate and materially misleading for Target to report delinquencies following Plaintiff's Bankruptcy filing.

287. Rather than using the bankruptcy information sent specifically to Target, which Target knew or should have known existed, Target continued reporting inaccurately on Plaintiff's credit reports.

///

///

288. Target's credit reporting information is relevant to Plaintiff's credit score, and Target's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

289. Therefore, Target's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

290. Through this conduct, Target has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that Target knew or should known was inaccurate and materially misleading.

291. Target and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

292. Equifax even reported the Bankruptcy in its respective "Public Records" section of Plaintiff's credit report, and reflected that the Bankruptcy was filed on August 2013 and discharged in December 2016. Therefore, Equifax had notice of the Bankruptcy.

293. Moreover, Equifax had notice of the Bankruptcy due to multiple other accounts reporting in Plaintiff's credit reports notating the Bankruptcy.

294. However, even with notice of the Bankruptcy filing and discharge, Equifax allowed Target to report the above inaccurate and derogatory information, for a debt that was included and discharged in the Bankruptcy, after Plaintiff filed the Bankruptcy and received a discharge.

295. Rather than using the publicly available bankruptcy information that Equifax knew or should have known existed, Equifax chose to allow Target to continue reporting inaccurately on Plaintiff's credit reports.

296. Equifax's credit reporting information is relevant to Plaintiff's FICO credit score, and Equifax's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

297. Therefore, Equifax's inaccurate and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

298. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

299. On or about August 2017, Plaintiff disputed Target reported information regarding the Debt pursuant to 15 U.S.C. § 1681I(a)(2) by notifying Equifax, in writing, of the incorrect and inaccurate credit information furnished by Target.

300. Specifically, Plaintiff sent a letter, via certified mail, to Equifax (the "Dispute Letter"), requesting the above inaccurate information be corrected/deleted pursuant to Plaintiff's Bankruptcy and corresponding Metro 2 reporting instructions.

301. The Dispute Letter further requested that Equifax:

- Immediately delete the disputed derogatory information from my credit report and update my credit report accordingly.

- If you do not immediately correct the disputed information on my credit report, please include the "Consumer Dispute" section above as my dispute statement for this account on my credit report.

302. Upon information and belief, Equifax timely notified Target of Plaintiff's dispute, but they both continued reporting inaccurate, derogatory information.

303. Target was required to conduct a reasonable investigation into this specific account on Plaintiff's consumer report pursuant to 15 U.SC. § 1681s-2(b)(1)(A).

304. Equifax was required to conduct a reasonable reinvestigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. §1681i.

305. On or about August 27, 2017, Plaintiff received notification from Equifax that Target and Equifax received notice of Plaintiff's dispute pursuant to 15 U.S.C. § 1681i(a)(6) and were providing the results of the reinvestigation.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

306. However, rather than remove the above derogatory information from Plaintiff's report, Target and Equifax simply left derogatory information on Plaintiff's report.

307. Specifically, Target and Equifax reported the following inaccurate and derogatory information on Plaintiff's credit in respect to the Target account:

- Historical Account Information: $761-$847 Past Due from August 2015 to December 2016.

308. Equifax did not provide notice to Plaintiff that her dispute was "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3).

309. Moreover, upon information and belief, Equifax's reinvestigation was not reasonable. More specifically, Equifax should have discovered from its records, including Plaintiff's official dispute letter, that the information Target was reporting was inaccurate and materially misleading. Equifax could have easily ascertained that the Target account was not delinquent or outstanding by reviewing the publically available and accessible bankruptcy records discussed above or contacting Plaintiff for more information.

310. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b).

311. Accordingly, Equifax failed to conduct a reasonable reinvestigation with respect to the disputed information as required by 15 U.S.C. §1681i.

312. Upon information and belief, Target's investigation was also not reasonable. More specifically, Target should have discovered from its records, including Plaintiff's official dispute letter, that the information Target was reporting was inaccurate and materially misleading. Specifically, Target could have simply reviewed the bankruptcy records discussed above and personally received by Target throughout the course of the Bankruptcy and recognized that Plaintiff was not delinquent on her Chapter 13 Repayment Plan.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

313. Accordingly, Target failed to conduct a reasonable investigation with respect to the disputed information as required by 15 U.SC. § 1681s-2(b) by:

    a.  Failing to remove all of the disputed and incorrect information;

    b.  Failing to update Plaintiff's Account (history); and

    c.  Failing to notate, as required, Plaintiff's dispute.

314. Through this conduct, Target has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that Target knew or should known was inaccurate and materially misleading.

315. Target and Equifax failed to review all relevant information provided by Plaintiff in the dispute to Equifax as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

316. Due to Target and Equifax's failure to reasonably (re)investigate, they each further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

317. Plaintiff's continued efforts to correct Target and Equifax's erroneous and negative reporting of the Debt by communicating Plaintiff's dispute with Target and Equifax were fruitless.

318. Target and Equifax's continued inaccurate and negative reporting of the Debt in light of its knowledge of the actual error was willful.

319. Target and Equifax's failure to correct the previously disclosed inaccuracies on Plaintiff's credit report was intentional and in reckless disregard of its duty to refrain from reporting inaccurate information. Accordingly, Target and Equifax willfully and negligently failed to comply with its duty to reasonably investigate Plaintiff's dispute.

320. Target and Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101

321. By inaccurately reporting account information relating to the Debt after notice and confirmation of its errors, Target and Equifax failed to take the appropriate measures as determined in 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE FAIR CREDIT REPORTING ACT

### 15 U.S.C. §§ 1681 ET SEQ.

### [AGAINST ALL DEFENDANTS]

322. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

323. The foregoing acts and omissions constitute numerous and multiple willful, reckless, or negligent violations of the FCRA, including, but not limited to, each and every one of the above-cited provisions of the FCRA, 15 U.S.C. § 1681.

324. As a result of each and every negligent noncompliance of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681o(a)(2), from Defendants.

325. As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow, pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

### COUNT II

### VIOLATION OF CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT

### CAL. CIV. CODE § 1785.1 ET SEQ.

### [AGAINST ALL FURNISHER-DEFENDANTS]

326. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

C.O. LAW , APC
750 B. STREET , SUITE 3300
SAN DIEGO , CA 92101

327. The foregoing acts and omissions constitute numerous and multiple violations of the California Consumer Credit Reporting Agencies Act.

328. In the regular course of its business operations, Defendants routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendants' consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

329. Because Defendants are partnerships, corporations, associations, or other entities, and are therefore each a "person" as that term is defined by Cal. Civ. Code § 1785.3(j), Defendants are and always were obligated to not furnish information on a specific transaction or experience to any consumer credit reporting agency if they knew or should have known that the information is incomplete or inaccurate, as required by Cal. Civ. Code § 1785.25(a). Thus, Defendants violated Cal. Civ. Code § 1785.25(a).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants:

- An award of actual damages, in an amount to be determined at trial or damages of a maximum of $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), against Defendants for each incident of willful noncompliance of the FCRA;

- An award of punitive damages, as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2), against Defendants for each incident of willful noncompliance to the FCRA;

- An award for costs and reasonable attorney's fess, pursuant to 15 U.S.C. § 1681n(a)(3), against Defendants for each incident of negligent noncompliance of the FCRA;

- An award of actual damages in an amount to be determined at trial pursuant to 15 U.S.C. § 1681o(a)(1) against Defendants for each incident of negligent noncompliance of the FCRA;

- An award of costs and litigation and reasonable attorney's fees pursuant 15 U.S.C. § 1681n(a)(3) and 15 U.S.C. § 1681o(a)(2) against Defendants for each incident of noncompliance of the FCRA;

- An award of actual damages, in an amount to be determined at trial, pursuant to Cal. Civ. Code § 1785.31(a)(2)(A), against Defendants;

- Award of attorneys' fees and costs pursuant to Cal. Civ. Code § 1785.31(a)(1); and, Cal. Civ. Code § 1785.31(d) against Defendants;

- An award of punitive damages of $100-$5,000 per willful violation of Cal. Civ. Code § 1785.25(a), pursuant to Cal. Civ. Code § 1785.31(a)(2)(B) against Defendants;

- For equitable and injunctive relief pursuant to Cal. Civ. Code § 1785.31(b) against Defendants;

- Any and all other relief the Court deems just and proper.

Dated: October 26, 2017                    Respectfully submitted,

**C.O. LAW, APC**

By: /s/ Clark Ovruchesky
CLARK OVRUCHESKY, ESQ.
ATTORNEY FOR PLAINTIFF

### TRIAL BY JURY

330. Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Dated: October 26, 2017                    Respectfully submitted,

**C.O. LAW, APC**

By: /s/ Clark Ovruchesky
CLARK OVRUCHESKY, ESQ.
ATTORNEY FOR PLAINTIFF

C.O. LAW, APC
750 B. STREET, SUITE 3300
SAN DIEGO, CA 92101